**UNITED STATES of America**

v.

**Charles E. GREER, Appellant.**

**No. 75–1340.**

United States Court of Appeals, District of Columbia Circuit.

June 29, 1976.

---

Michael Branham, Washington, D.C., was on the brief for appellant.

Earl J. Silbert, U. S. Atty., John A. Terry, Stuart M. Gerson, John R. Dugan, James M. Hanny and John L. Kern, Asst. U. S. Attys., Washington, D.C., were on the brief for appellee.

Before BAZELON, Chief Judge, and ROBINSON and ROBB, Circuit Judges.

Opinion for the Court filed by Chief Judge BAZELON.

Circuit Judge ROBB concurs in the result.

BAZELON, Chief Judge:

Appellant was convicted in 1972 of armed robbery and assault with a dangerous weapon. After serving more than two years in prison, he was paroled. Shortly after the trial ended, evidence was developed that indicated that a person whom appellant claimed to have been with prior to the alleged crime—a person whom the Government's rebuttal evidence had suggested did not exist—was, in fact, with the appellant. Recently, the victim of and sole eyewitness to the alleged offense has recanted his identification and then recanted his recantation. The trial court, with commendable concern for the interests of justice, advises that it "now has serious doubts as to the validity of [the] original identification" and believes that "on an adequately presented case defendant would in every probability not have

been convicted." Accordingly, upon the request of the district judge—and absent any opposition by the Government *—the case will be remanded.

I

On December 9, 1971, appellant was arrested on charges of having robbed John Dupree, the night manager at Kenilworth American Service Station, on November 12, 1971. Appellant was released on personal recognizance with conditions. A trial date was set but at least two continuances were granted, once because appellant's retained counsel was in trial and once because the court had another trial in progress.

On September 18, 1972, the case was called for trial, but defense counsel stated he was unprepared. Counsel asserted that he had moved from the District of Columbia one month earlier, had returned only to retry two Superior Court cases, and had thought that his former associate, who also had worked on the case, would represent appellant. Counsel stated that, "I have been trying to review my notes to bring myself up to date and things are coming back; but, really, as I indicated, I am not ready." The district court adjourned the case until 2:00 p. m. so that counsel could contact his former associate and one of them could review their file and locate the defense witnesses. When the case was called in the afternoon, both lawyers were present and the original defense counsel expressed no objection to proceeding. A full hearing was held on appellant's motion to suppress the victim's identification, and trial did not begin until the next day.

The Government's evidence at trial tended to show that at about 3:30 a. m. on November 12, 1971, Dupree was held at gun point[1] and searched by two men, and that his wallet containing $5, watch worth $89, and roughly $37 in cash belonging to the

---

* The United States Attorney and Assistant United States Attorneys listed above as "on the brief for appellee" filed a brief before the victim recanted his identification.

1. At trial, Dupree testified that only one robber—the appellant—had been armed. (Tr. at 94, 96.) The investigating officer who spoke to Dupree ten days after the robbery testified, however, that Dupree had told him both robbers were armed. (Tr. 177.)

gas station were taken.[2] The entire transaction took place in a lighted room and consumed about fifteen minutes,[3] although during much of that time Dupree could not see the robbers.[4] Dupree immediately called the police, and when they arrived described the two robbers. The first was said to be a Negro male, medium height, short hair, age 20–25, wearing brown pants.[5]

Later that morning Dupree went to the precinct. After looking through roughly seven books of photographs of young suspects, he picked out a picture of appellant as resembling one of the robbers.[6] He testified that he made this identification on the basis of the robber's complexion, and eyes and cheeks that "kind of stuck out."[7] Ten days later Officer Boteler, who was investigating the case, interviewed Dupree. Dupree described the first suspect as about six-feet, 200 pounds, and dark-complexioned, and informed Boteler that he had made a photo identification. Boteler was unable to find any record of it, and therefore brought Dupree back to the precinct, where Dupree pulled the books he had

looked at from the shelves, and after examining three books, picked out the picture he had previously identified and said, "This is it."[8] Later that night Boteler showed his own photograph book to Dupree, and Dupree identified a second photograph of appellant. Dupree explained at trial that he had picked out the photo because, "It was the same person."

After this third identification, Boteler obtained an arrest warrant for appellant. Within a week, appellant turned himself in. A lineup was then held, and Dupree again identified the appellant. At trial Dupree made a final, in-court identification.

Appellant testified on his own behalf and denied participating in any robbery. He stated that on the night in question he had been at the Stonewall Gridiron Club, and then at a party at Aubrey Klinsdale's home on Brandywine Street where he stayed until about 6:00 a. m. when he left with Clifton Fitzgerald. He was at the party the entire time, he stated, except for roughly an hour at about midnight when he and Fitzgerald drove a person named Rayburn back to his halfway house and then went to

2. Dupree did not tell the police officer who came to the gas station immediately after the robbery, or the investigating officer who came later, that the watch was stolen. (Tr. 155, 183.) The watch apparently was first mentioned by Dupree in talking with the United States Attorney prior to testifying before the grand jury. (Trial Tr. 183.)

At trial (Tr. 94), and in talking to the two police officers (*id.* at 155, 182), Dupree also stated that his gun was stolen. However, the indictment did not mention theft of the gun.

3. At the preliminary hearing, the investigating officer testified that Dupree had told him that the robbery took about one minute. (Trial Tr. at 178.) At trial the officer had no recollection of having been told of the length of the robbery. (*Id.*)

4. At trial Dupree stated that he was placed against the wall while he was searched, but that he repeatedly turned around. (Tr. at 101, 125.) Dupree told the officer on the scene, however, that he had been forced to the ground. (Tr. at 154.)

5. This is the description that was recorded by the police officer who came to the gas station. (Tr. at 151.) Dupree recalled also having told the officer that the suspect was dark-skinned,

heavy, wearing a black coat (Tr. at 104), but denied having made any reference to height (Tr. at 142), other than to say the robbers were taller than Dupree (Tr. at 123).

6. A clerk in the Robbery Branch of the Police Department testified that Dupree said the photo resembled the robber. (Tr. at 102.) In addition, a form which the clerk had completed at the time of the identification was introduced, and the form indicated that Dupree had made a "look-alike" rather than a positive identification. However, Dupree testified that he had made a positive identification. (*Id.* at 133.)

7. At the hearing on the motion to suppress the identification, Dupree stated that he made the identification on the basis of the jutting eyes and the small bush haircut of the person in the photograph. (Tr. at 30–31.) When confronted with the photo, however, Dupree conceded that it showed a closely cropped haircut, not a small bush. (Tr. at 66–67.)

8. This is according to Officer Boteler's testimony. (Tr. at 175). Dupree stated that he answered in the affirmative the questions "Is this him?" and "Are you sure?" (Tr. at 137.)

a Chinese restaurant. Appellant was impeached with an eight year old petty larceny conviction.

Appellant's testimony was largely corroborated by Fitzgerald, but he could not recall the date of the party. Fitzgerald did add one detail, however: he testified that Rayburn's halfway house was on C Street, Northeast. Appellant's testimony, including the date of the party, also was corroborated by his brother and two friends; the brother recalled the date because it was the first day he ever went horseback riding, one friend recalled it because it was two days before her daughter's birthday, and the other recalled it because on that day he had gone horseback riding, seen his lawyer about custody over his children, and arrived home to find that his estranged wife had returned.[9]

In rebuttal, the Government called a representative of the Rehabilitation Residential Treatment Center, a halfway house on C Street, Northeast. He testified that the previous night he had reviewed the Center's records at the prosecutor's request, and had found that on November 12, 1971 there was no person with the first or last name Rayburn residing at the Center.

Appellant was convicted of armed robbery and assault with a deadly weapon. Five days later he moved for a judgment of acquittal or in the alternative for a new trial. His motion and accompanying memorandum essentially rehearsed the evidence adduced at trial and some authorities as to setting aside jury verdicts. In summarizing Strickland's testimony, however, the motion stated:

> Note: Mr. Howard Rayburn Baylor, of 3830 Ninth Street, S.E., introduced himself to counsel (displayed a driver's permit) and stated he was at said Halfway House from July 28(9) to December 13, 1971. This introduction occurred

Wednesday evening, September 20, 1972 [the night trial ended].

The district court denied the motion ten days later. On November 20, 1972 appellant was sentenced to concurrent terms of two to six years on each count.[10] Appellant immediately noted an appeal, and was denied bail pending the appeal.

Regrettably, adjudication of the appeal was unduly delayed. It was not scheduled for argument until almost a year after sentencing, largely because counsel for each side obtained several extensions of the time for filing their briefs. Shortly before the date set for argument, appellant filed a *pro se* motion for leave to retain new counsel; that motion was granted, and briefing began again with each side granted at least one extension. Almost two years after sentencing the case was finally submitted without oral argument, and two months later a memorandum opinion issued.

In that opinion, a division of this court reversed the denial of a new trial and the case was remanded for "inquiry into the 'Rayburn' situation." We stated that if appellant could establish that he drove a man named "Rayburn" to his halfway house on the night in question, he "would be entitled to . . . relief, unless the trial court finds to the contrary for reasons which presently do not appear to us."

On remand the district court promptly conducted an evidentiary hearing at which Howard Rayburn Baylor corroborated appellant's trial testimony. In addition, an employee of the Residential Treatment Center reported that the Center's records showed that on the night in question "Rayburn" was residing at the halfway house, had been out on a pass and had signed back in at 11:45 p. m.

On cross-examination "Rayburn" was questioned about his pretrial contacts with appellant and his counsel. He testified that

---

**9.** A fifth defense witness also testified to having been at an all-night party with appellant in early November, but could not remember the date.

**10.** Subsequent to the imposition of sentence, this court decided, in *United States v. Johnson,*

155 U.S.App.D.C. 28, 475 F.2d 1297 (1972), that assault with a dangerous weapon is a lesser included offense of robbery or armed robbery. Consequently, it was error to receive a verdict from the jury on the assault count.

he had seen appellant on several occasions between appellant's arrest and trial, and had been interviewed by the associate of trial counsel, and by another lawyer whose name he did not remember but who he presumed was trial counsel. "Rayburn" stated that he had given his address to the associate of trial counsel, but was told that he probably would not be needed since the defense looked strong, and his testimony did not appear that valuable. He denied having spoken to any lawyer after the verdict was rendered. In a colloquy with the trial judge, appellant corroborated "Rayburn's" testimony. Appellant added that at trial, after the Government's rebuttal, appellant had told his counsel that he didn't know "Rayburn's" full name but would find it out, and that the same evening he had found "Rayburn" and brought him to the halfway house. Appellant's counsel at the hearing reported that he had been unable to locate either trial counsel or his associate.

On February 11, 1975, the district court denied the motion for a new trial. Crediting "Rayburn's" uncontradicted testimony, the court found the statement in the new trial motion concerning the "discovery" of "Rayburn" to be "highly misleading," since "[t]he evidence suggests that counsel made a tactical decision" not to call "Rayburn", presumably because his testimony that he was taken home at 12:00 a. m. would have been collateral to the issue of whether defendant committed a robbery at 3:30 a. m.[11] Appellant again noted an appeal.

On this appeal, appellant's brief was filed only a few days after it was due. The government received two extensions, and filed its brief on August 25, 1975. The case was set for argument on October 23, 1975.

On October 22nd, the parties filed a joint motion to postpone argument and hold the case in abeyance. The motion reported that in an affidavit dated October 17, 1975, John Dupree had recanted his identification of appellant. Dupree stated that he had not been positive of the photograph identifications when he made them; that the police repeatedly had told him that the person he had picked out "had a record and a history of gas station robberies" and had to be the robber; and that Dupree's employer pressured Dupree into testifying. He further had stated that he accidently had met appellant and had volunteered to help him. On the basis of this affidavit, we granted the joint motion.

Appellant again moved in the district court for a judgment of acquittal or for a new trial. At a hearing on February 13, 1976, Dupree recanted his recantation. The district court nevertheless has forthrightly concluded, as previously noted, that Dupree's identification is suspect and that "the interest of justice" demands a new trial.

## II

It is a cardinal principle of Anglo-American jurisprudence that, in Blackstone's immortal words, better ten guilty persons should go free than one innocent person be convicted.[12] Implicit in this principle is a recognition that in any system some innocent persons unavoidably will be convicted. But no one wants to see an innocent person suffer, and all are anguished when confronted with an unjust verdict of guilty.

---

11. The evidence clearly indicated that at one time counsel made a tactical decision that he probably would not call "Rayburn." There was no evidence, however, which indicated that after the Government's rebuttal case, counsel remembered having spoken to Rayburn but decided not to produce him or ask the halfway house representative about him. Indeed, the available evidence, see *infra*, makes the opposite inference at least equally likely.

This court has repeatedly held that tactical judgments must be established by proof, not surmise. *See, e. g., United States v. Moore,* 174 U.S.App.D.C. 113, 529 F.2d 355, 358 n. 7

(1976); *United States v. DeCoster,* 159 U.S. App.D.C. 326, 487 F.2d 1197, 1204 (1973); *Campbell v. United States,* 126 U.S.App.D.C. 250, 377 F.2d 135 (1966); *Jackson v. United States,* 125 U.S.App.D.C. 307, 371 F.2d 960 (1966). Once the reasons for counsel's decisions not to produce or mention "Rayburn" became critical, appellant might have been given an additional opportunity to locate trial counsel, and the Government might have been requested to provide assistance.

12. 4 W. Blackstone, Commentaries ch. 27, p. 358.

As the district court has concluded, this may well be such a case, and this appellant may have been unjustifiably incarcerated for over two years.

It is, unfortunately, beyond anyone's power to undo the two years appellant spent in prison. Nor is it possible to adequately compensate him for the stigma visited upon him, the pain he suffered, or for the deprivation of his liberty.[13] But we can—and must—make every effort to learn from this failure of the system, so that future failures might be avoided.

Perhaps the first lesson to be derived from the history of his case is that delay at the appellate level can cause great injustice. It is of little consequence that, by chance, in this case almost all the delay on the two appeals occurred during the briefing stage. Our concern is not with assigning blame, but with learning for the future. Plainly, over two years to adjudicate the first appeal, or more than eight months to ready the second for adjudication, is far too long. The price of this delay may well have been that an innocent person was incarcerated. Thus, the wisdom of Judge Wright's recent exhortation is underscored: "The time has come to move seriously toward genuine assurance that appeals will be considered expeditiously." [14]

Second, this case suggests the wisdom of adopting a specific procedure that recently has been recommended by several commentators: requiring counsel, either orally or in writing, to detail their preparation to the trial judge outside the prosecutor's presence.[15] We have considerable doubt that at trial, defense counsel recalled his interview with "Rayburn." If he did recall, two questions arise: why did he not so indicate in cross-examining the halfway house representative, and why did he state in the new trial motion that "Rayburn" was "newly discovered." Had counsel been required, prior to trial, to list the witnesses interviewed, this might have triggered his memory of "Rayburn." At the very least, it would have elicited evidence that would have been most useful at the hearing on the motion for a new trial in determining whether counsel forgot about "Rayburn" or made a reasoned tactical decision not to call him.

Third, the case highlights the usefulness of conducting evidentiary hearings when a new trial motion suggests the availability of newly discovered evidence, even though the evidence may not appear sufficiently material. To be sure the suggestion here was buried in a motion which otherwise merely recited the trial testimony. It was not until the first appeal that "Rayburn's" discovery emerged as a major issue. But with 20–20 hindsight, it is surely unfortunate that more than two years passed before the facts surrounded the "discovery of Rayburn" were even aired.

Finally, this case stands as a sobering reminder of a principle which is often stated but easily forgotten: "identification testimony presents special problems of reliability," and "the very real danger of mistaken identification [is] a threat to justice." [16]

---

13. Of course we intimate no view as to whether appellant has a cause of action against the prosecutrix or any other person. *See generally*, W. Prosser, Handbook of the Law of Torts § 117 (4th ed. 1971).

14. *United States v. Sarvis*, 173 U.S.App.D.C. 228, 235, 523 F.2d 1177, 1184 (1975).

15. *See, e. g.*, Boston University Center for Criminal Justice, Right to Counsel in Criminal Cases 193–98 (1976); Bazelon, *The Realities of Gideon and Argersinger*, 64 Geo.L.J. 811 (1976); Finer, *Ineffective Assistance of Counsel*, 58 Cornell L.Rev. 1077, 1088 (1973); Grano, *The Right to Counsel: Collateral Issues Affecting Due Process*, 54 Minn.L.Rev. 1175, 1248 (1970). *See also United States v. Simpson*, 154 U.S.App.D.C. 350, 475 F.2d 934, 936–42 (Bazelon, C. J., dissenting), *cert. denied*, 414 U.S. 873, 94 S.Ct. 140, 38 L.Ed.2d 91 (1973). In *Simpson* I appended to my opinion a form that could be used for this purpose. *See id.* at 941–42. The Superior Court's Criminal Justice Act Committee recently has developed a more extensive form that also could be useful here.

If submitting information about counsel's preparation prior to trial would pose problems in cases tried by the court, then the submission could be delayed in those cases until after trial.

16. *United States v. Telfaire*, 152 U.S.App.D.C. 146, 469 F.2d 552, 555 (1972). *See also, e. g., United States v. King*, 149 U.S.App.D.C. 61,

Here, the trial testimony indicated that all the indicia of reliability to which this court has repeatedly looked were present,[17] and the district court conducted a thorough hearing before admitting the evidence. Nevertheless, the district court now seriously doubts the identification's validity.

We can never know whether, if the identification was inaccurate, it was caused by pressure from the police and the employer as alleged in Dupree's affidavit; bad faith on Dupree's part; human fallibility; the suggestiveness inherent whenever one views photographs maintained by the police department; or the equally inherent pressure an eyewitness may feel to select at least one photograph in an array.[18] Nor can we ever know whether subsequent photographic and corporeal identifications were based on Dupree's recollection of the photograph, rather than on his recollection of the robber. Even more than in most cases, the trial testimony suggests that this was true. All that we do know is that in an ideal world, persons would not be imprisoned on the basis of misidentification.

But ours is not an ideal world, or an ideal criminal justice system. In the final analysis, this case may be most significant as an antidote to complacency, as a reminder of how imperfect justice can be even when administered by an experienced and compassionate trial judge, in an open and fully adversarial proceeding. For this appellant, any efforts we make to improve the administration of criminal justice will come too late. All we can do for him is to grant the district court's request that we remand the case.

*So ordered.*

ROBB, Circuit Judge:

I concur in the result only, *i. e.,* the case is remanded to the District Court at the request of the district judge. I do not join in the opinion.

461 F.2d 152, 157–58 (1972) (Bazelon, C. J., concurring); *United States v. Hamilton,* 137 U.S.App.D.C. 89, 420 F.2d 1292, 1295 (1969) (Robinson, J.).

**17.** The victim had a sustained opportunity to observe the robbers; he made the first identification while his memory of the incident was fresh but after the severe emotional distress presumably subsided; there was no hint of suggestivity in the photographs he viewed or in the words of any policeman or prosecutor; and the victim showed a capacity to discriminate in his identifications by identifying only one of the two robbers. For cases in which at least some of these factors have been relied upon, *see, e. g., United States v. Neverson,* 150 U.S.App.D.C. 133, 463 F.2d 1224 (1972); *United States v. Clemons,* 144 U.S.App.D.C. 235, 445 F.2d 711, *cert. denied,* 404 U.S. 956, 92 S.Ct. 322, 30 L.Ed.2d 273 (1971); *United States v. Williams,* 137 U.S.App.D.C. 231, 421 F.2d 1166 (1970); *Macklin v. United States,* 133 U.S.App.D.C. 139, 409 F.2d 174 (1969); *Clemons v. United States,* 133 U.S.App.D.C. 27, 408 F.2d 1230 (1968), *cert. denied,* 394 U.S. 964, 89 S.Ct. 1318, 22 L.Ed.2d 567 (1969).

**18.** *See generally,* P. Wall, Eyewitness Identification in Criminal Cases (1965).