**UNITED STATES of America**

v.

**Robert J. BUTLER, Appellant.**

**Nos. 78–1458, 79–1014.**

United States Court of Appeals,
District of Columbia Circuit.

Submitted June 6, 1979.
Decided Oct. 29, 1980.

Larry Martin Corcoran, Washington, D. C. (appointed by this court) was on brief, for appellant.

Earl J. Silbert, U. S. Atty., Washington, D. C., at the time the brief was filed, John A. Terry, Michael W. Farrell, James F. Rutherford and William E. Bucknam, Asst. U. S. Attys., Washington, D. C., were on brief, for appellee.

Before BAZELON, Senior Circuit Judge, TAMM, Circuit Judge, and BARRINGTON D. PARKER,* U.S. District Judge for the District of Columbia.

Opinion for the court filed by District Judge BARRINGTON D. PARKER.

Dissenting opinion filed by Senior Circuit Judge BAZELON.

BARRINGTON D. PARKER, District Judge:

Appellant Robert J. Butler was charged in a multicount indictment with possession of phenmetrazine with intent to distribute on four separate dates: June 30, August 16, August 19 and October 31, 1977. The jury returned a verdict of guilty on the June and August dates, the first three counts. It was unable to reach a verdict on the fourth count charging distribution on October 31 and after a partial verdict was accepted, the government dismissed that count.

Butler defended on the ground of misidentification and alibi. The government's case depended chiefly upon the testimony of Officer Vincent Scott, Metropolitan Police Department (MPD), who, while working undercover, allegedly purchased the drugs from appellant on the four occasions listed above. Butler contends the trial court committed prejudicial error by failing to enter a judgment of acquittal. The principal issue presented is whether the evidence was legally sufficient to submit the case to the jury and to sustain Butler's

* Sitting by designation pursuant to 28 U.S.C. § 292(a) (1976).

conviction.** We find that it was and we affirm.

Officer Scott testified that, while working undercover in the 14th Street area, he had observed Butler on several occasions engaged in what appeared to be drug transactions. Then, on the dates of the four-count indictment, he was approached by the appellant and, following a conversation with him, appellant sold Scott a quantity of phenmetrazine tablets. As to each transaction, Scott was in close proximity for periods of at least two to three minutes. Following each sale, Scott prepared a "buy" report detailing the transaction and including a description of the seller. Those descriptions, referring to Butler as John Doe # 8, differed in several respects from appellant's appearance. Most notably, they profile a person two inches taller, forty-five to sixty pounds heavier, and six years older. Appellant's counsel cross-examined Scott extensively about the divergent descriptions. Appellant also presented four witnesses who testified as to his whereabouts on the date of the final sale, October 31, 1977, Halloween. The government dismissed the October 31 count when the jury returned a partial verdict on the first three counts. Appellant argued at trial that by showing he was not present at one sale he had demonstrated he was not present at any of the alleged sales. Appellant was unable to produce evidence of his whereabouts on the dates of the first three sales.

Appellant claims the evidence was "insufficient to sustain a conviction" and therefore the trial judge's failure to enter a judgment of acquittal constitutes error. He bases this appeal on the unreliability of uncorroborated identification testimony, *see United States v. Greer*, 538 F.2d 437, 442 (D.C.Cir.1976), and his alibi proof on the fourth count.

■ This jurisdiction follows the "one-witness" rule allowing a case to be proven, with limited exceptions not relevant in this case, through the uncorroborated testimony of one eyewitness. *United States v. Telfaire*, 469 F.2d 552 (D.C.Cir.1972). In deciding whether a one-witness case should go to the jury it is incumbent upon the trial judge to consider a number of factors relating to the period of identification and to determine "whether the totality of circumstances 'give[s] rise to a very substantial likelihood of irreparable misidentification.'" *United States v. Levi*, 405 F.2d 380, 383 (4th Cir. 1968), *quoted with approval, Telfaire*, 469 F.2d at 555 n.5. In particular, the judge should consider the opportunity for identification, the lighting conditions, the duration of encounters, the strength of the identification and the judges's appraisal of the witness' capacity to observe. *Telfaire*, 469 F.2d at 555–59. Further, after making a determination to submit the case to jury, the trial judge should instruct the jury on how to properly evaluate identification testimony. *See Model Special Instruction on Identification, Telfaire*, 469 F.2d at 558. The trial court instructed the jury appropriately in this instance, giving a version of the "Telfaire instruction" tailored to fit the facts of this case. Tr. at 198–200.

. This Court is cognizant of the discrepancies between Scott's identification and reality. However, "[i]t is only when there is no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt that the judge may properly take the case from the jury." *United States v. Davis*, 562 F.2d 681, 683 (D.C.Cir. 1977). And in evaluating this determina-

** Appellant originally filed his appeal on this issue on July 31, 1978. No. 78–1458. Counsel for appellant on appeal withdrew that brief and filed a Motion for a New Trial with the trial court which motion was denied by order of December 22, 1978. On this appeal, No. 79–1014, consolidated with the earlier appeal by order of this Court, appellant also claims the trial judge committed prejudicial error by denying the motion for a new trial based on a claim of new evidence consisting of police "buy" re-

ports received at trial as "Jencks" material. This argument is without merit. The "buy" reports constitute eight hand-written pages prepared by Officer Scott after each drug sale. They were given to defense counsel as "Jencks" material prior to the commencement of the trial and cannot be considered "new evidence." *Thompson v. United States*, 188 F.2d 652 (D.C.Cir.1951); *see United States v. White*, 514 F.2d 205 (D.C.Cir.1975).

tion, "this court must view the evidence in the light most favorable to the government's position." *Crawford v. United States*, 375 F.2d 332, 334 (D.C.Cir.1967).

Proof by one-witness identification should be a jury question when, as in this case, a police officer, trained and experienced in identification has numerous occasions to observe a defendant under satisfactory conditions. Scott testified that he recognized the importance of accurate descriptions and that in his four years with the MPD, one year of which he spent undercover investigating illegal drug trafficking, he had a "fair amount of practice" describing those with whom he came into contact. Appellant had ample opportunity to impeach Scott's credibility during cross-examination. The issue of credibility was one for the jury to determine, not this Court. In addition, it was for the jury to decide whether or not Butler's alibi for the October 31 sale should serve as proof and offset the government's testimony as to whether Butler was indeed involved in the three earlier sales.

■ Taking the evidence in the light most favorable to the government this Court finds the evidence legally sufficient for submission of the case to the jury. Accordingly, the judgment is affirmed.

BAZELON, Senior Circuit Judge, dissenting:

From June through October, 1977, Officer Vincent Scott, an undercover agent with the Metropolitan Police Department, conducted an investigation of drug trafficking on 14th Street in Washington, D. C. During those months, he made over 100 "buys" from thirty-seven different suspects —or, in his words from thirty-seven different "John Doe's." To protect his "cover" for the investigation, he made no arrests until after the investigation was completed.

On November 29, 1977, while driving through the 14th Street area with a superior officer in the hope of making an arrest, Officer Scott spotted Robert Butler and announced: "There is John Doe Number 8." According to Officer Scott, "Number 8" had sold him narcotics on four occasions—June 30, August 16, August 19, and October 31. Based solely upon Officer Scott's statement that the man he saw on November 20 was "Number 8," Butler was arrested and convicted. This, despite the fact that Robert Butler bore little resemblance to "Number 8," as "Number 8" was described by Officer Scott in notes written just after each purchase.

This case poses a fundamental issue not addressed by the majority. In a striking way, it reveals the danger of injustice inherent in the so-called "one eyewitness rule," the rule that allows convictions based upon an uncorroborated identification by a single eyewitness.[1] To extend that "rule" to cases like the one at hand is to expand its scope well beyond what is justified by its rationale. Where the police can obtain corroborating evidence with reasonable effort, they should be required to do so. Here, it appears from the record that the police could have obtained verification for Officer Scott's testimony with little additional effort.[2] However, to afford the government an opportunity to explain why it did not expend such effort, I would remand the record for a hearing and findings of fact on that issue. Accordingly, I dissent.

## I.  THE IDENTIFICATION IN THIS CASE

Over a five-month period, Officer Scott saw a man he called "John Doe Number 8" almost a dozen times.[3] On four occasions, Scott bought narcotics from "Number 8." After each purchase, he filled out a "Buy Report," describing the person who sold him

---

1. *See, e. g., United States v. Telfaire*, 469 F.2d 552 (D.C.Cir.1972).

2. *See* p. 734 *infra.*

3. In addition to the four occasions on which he bought narcotics from "Number 8," Officer Scott saw "Number 8" three or four times before June 30, 1977, and two or three times between June 30 and August 16, 1977. Trial Transcript at 24–25. Record, Volume II.

the drugs.[4]  Two times, "Number 8" was wearing a T-shirt.[5]  On those days, Scott reported "Number 8's" weight at 185 and 189 pounds.[6]  On the other two occasions, Scott recorded "Number 8's" weight at 175 and 185 pounds.[7]  Yet, Robert Butler weighs only 130 pounds.[8]  This is an extraordinary discrepancy.  When asked to explain it, Officer Scott testified that, when arrested, Butler appeared heavier than 130 pounds because he was wearing two pairs of pants.[9]  Of course, this does not explain why Scott would have miscalculated "Number 8's" weight on the nights he made the purchases.[10]  What it does explain—inadvertently, to be sure—is why Scott may have mistaken Butler for the heavier "Number 8" on the night of the arrest.[11]

Furthermore, weight was not the only area of discrepancy between Officer Scott's descriptions of "Number 8" and the facts about Robert Butler.  Admittedly, the other discrepancies are minor, or develop only if the testimony of defense witnesses is credited.[12]  But their existence certainly does nothing to lend authority to the officer's identification.  And, when they are seen in combination, even plausible discrepancies can reveal a disturbingly consistent penchant for inaccuracy.  Such is the case here.

One final matter should be noted.  All parties agreed that when Robert Butler was arrested, he had no drugs in his possession.[13]  He made no statements that would indicate that he knew or recognized Officer Scott.[14]

4.  The four "Buy Reports" are reproduced as Appendix I to this opinion.

5.  Trial Transcript at 42–44.  Record, Volume II.

6.  "Buy Reports 1 & 2."  Appendix I.

7.  "Buy Reports 3 & 4."  Appendix I.

8.  Report of Investigation, PD 854.  Appendix II.

9.  Trial Transcript at 41–42.  Record, Volume II.

10.  *See* note 6 *supra.*

11.  Such an illogical explanation for the discrepancy also displays the defensiveness with which Scott came to treat his identification of Butler as "Number 8."  It is a fact that eyewitnesses develop an "investment" in their identification.  *See* Part II *infra.*

12.  For example, Officer Scott, after standing next to "Number 8" for several minutes on each occasion, four times put that man's height at 5'9".  "Buy Reports."  Appendix I.  Yet, Robert Butler is 5'7".  Report of Investigation, PD 854.  Appendix II.  Or, for another example, Officer Scott consistently noted "Number 8's" age as 35.  "Buy Reports."  Appendix I.  Yet, Robert Butler is 29.  Report of Investigation, PD 854.  Appendix II.
  Testimony by several defense witnesses, while not to be accepted unquestioningly, further highlights this pattern of dissimilitude between Officer Scott's contemporaneous descriptions of "Number 8" and the reality of Robert Butler.  The man Officer Scott knew as "Number 8" was nicknamed "Billy."  "Buy Reports 2, 3, & 4."  Appendix I.  Yet, according to both his father, Trial Transcript at 109, Record, Volume II, and his friends, Trial Transcript

at 119, 125, Record, Volume II, Robert Butler was *never* called "Billy."  Officer Scott reported that "Number 8" grew a moustache between August 19 and October 31.  *Compare* "Buy Reports 1, 2, & 3" *with* "Buy Report 4."  Yet, Robert Butler's father testified that there had been no change in his appearance during the period from June 30, 1977, to October 31, 1977.  Trial Transcript at 108.  Record, Volume II.  According to Officer Scott, on two occasions "Number 8" was wearing black and white shoes and a black T-shirt.  "Buy Reports 1 & 2."  Record, Volume II.  Yet, Robert Butler's parents swore that their son did not own either black and white shoes or a black T-shirt.  Trial Transcript at 93–94, 108, Record, Volume II.  Moreover, Officer Scott swore that he dealt with the same person on June 30, August 16, August 19 and October 31.  When asked in December to account for his whereabouts on those four dates, the defendant said that he could not remember his activities on what were to him three randomly selected nights in months past.  However, he said that he could remember his whereabouts on one of the nights—October 31, Halloween.  And, there was testimony that Robert Butler was not out of the house on that night.  Trial Transcript at 89–95, 105.  Record, Volume II.  Indeed, one of the odd things about the jury verdict in this case is that the jury could not convict Butler of being "Number 8" for purposes of Count IV, apparently because some of its members believed Butler's alibi for October 31.  Yet, those same members of the jury believed he was "Number 8" for purposes of the other three dates.

13.  Transcript of Preliminary Hearing at 17.

14.  *Id.*

And, he did not flee.[15] While these facts are not conclusive, they cast doubt only on Butler's guilt, not on his innocence.

Officer Scott presented himself as a trained and careful observer. This claim of expertise only serves to accentuate the discrepancies between, on the one hand, Scott's descriptions of the man he called "John Doe Number 8" and, on the other hand, the uncontested facts about Robert Butler. The more one credits Scott's powers of observation, the greater weight must be given to his contemporaneous descriptions of "Number 8," and the more implausible it becomes that Robert Butler is "Number 8." Nonetheless, in spite of all, Officer Scott asserted at trial that Robert Butler was the man he knew as "Number 8." And based upon that assertion, and it alone, Robert Butler was sent to prison.

## II. THE UNRELIABILITY OF EYE-WITNESS IDENTIFICATION

Whatever doubt about identification testimony the circumstances of this case provokes, it is intensified by inquiry concerning the reliability—or unreliability—of eyewitness testimony generally. There is now a wealth of literature demonstrating the tendency of such evidence to be inaccurate.[16] Of course, this literature does not dictate a conclusion about Scott's identification of Butler. But it should alert us to an important problem that cannot be ignored in cases of this kind. As Judge McGowan noted, many experts have concluded that convictions based solely on "one eyewitness" identifications represent "conceivably the greatest single threat to the achievement of our ideal that no innocent man shall be punished."[17] I will not rehearse here all of the recent literature in this area.[18] Rather, I will confine myself to highlighting the main themes that bear on the case before us.

We are told that jurors place great faith in eyewitness testimony—even in the face of information that discredits it.[19] Further, jurors tend to believe assertive, confident witnesses more readily than less positive ones. Yet, recent studies suggest that there is in fact no relationship at all between confidence and accuracy.[20] Indeed, when misleading information is introduced into a witness's "memory" close to the time he testifies, studies suggest he actually can be more confident about wrong than right information.[21] Also, witnesses often become more confident of the accuracy of their identification with the passage of time[22]—as Officer Scott apparently did in the instant case.[23]

Juries perceive trained observers, like policemen, as especially reliable identification witnesses. In this case, the prosecutor played upon that belief.[24] Yet, there is now

15. Id.

16. See, e. g., E. Loftus, Eyewitness Testimony (1980) (cited hereinafter as Loftus); A.D. Yarmey, The Psychology of Eyewitness Testimony (1979) (cited hereinafter as Yarmey); N. Sobel, Eyewitness Identification: Legal and Practical Problems (1972) (cited hereinafter as Sobel); P. Wall, Eye-Witness Identification in Criminal Cases (1965) (cited hereinafter as Wall).

17. McGowan, Constitutional Interpretation and Criminal Identification, 12 Wm. & Mary L.Rev. 235, 238 (1970). Of course, nobody would be satisfied with a system that convicts innocent people based upon misidentifications. It should also be noted, however, that with each such conviction a guilty person goes free.

18. In addition to the books noted in footnote 16, there is an excellent compilation of recent data in Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification, 29 Stanford L.Rev. 969, 974–89 (1977) (cited hereinafter as Stanford).

19. Loftus, Reconstructing Memory: The Incredible Eyewitness, Psychology Today, Dec. 1974 at 117.

20. Id. See also Wall, supra note 16, at 15–16.

21. Loftus, supra note 16, at 101.

22. Wall, supra note 16, at 15; Stanford, supra note 18, at 985 & n.59.

23. Compare Grand Jury Transcript at 7 with Preliminary Hearing Transcript at 14.

24. The government, in its closing argument at trial, put the issue in terms of the jury's willingness to believe Officer Scott: "[T]he only way you can find [the defendant] not guilty is . . . if

evidence indicating that the police may be no better at identification than ordinary citizens.[25]

What has been said so far deals with the way witnesses behave as they testify about their recollections. But learning about the operation of the memory itself as it seeks to "recall" an identity is even more revealing. Scholars have rejected the popular notion that the memory acts like a tape recorder, where remembering is merely a process of playing back the tape. We now know that "memory ... is an active, constructive process that often introduces inaccuracies by adding details not present in the initial representation or in the event itself."[26]

Of particular relevance to this case is the constructive role in memory of a phenomenon called "transference." People often have difficulty remembering the context in which they first encountered a piece of information.[27] Thus, it is possible for a witness to *correctly* identify a person as one whom he has met, while *incorrectly* placing that person in a particular context.[28] It is conceivable that this kind of "transference" occurred in the instant case. We know that Robert Butler sometimes passed through the area in which the transactions between "Number 8" and Officer Scott took place.[29] It is probable that Officer Scott, who for five months staked out that area, had seen Butler. Therefore it would not be surprising if, having spotted Butler in that same neighborhood about a month after his last contact with "Number 8," Scott recognized Butler, associated him with the context of that neighborhood on earlier occasions, and unconsciously transferred his memories about "Number 8" to Butler.

Aspects of "memory" operation other than "transference" aggravate the danger of misidentification in cases like the one at hand. There is extensive research showing that observers unwittingly distort their perceptions to comport with personal needs. This phenomenon creates a serious danger of mistake in cases where there is pressure on the observer to identify someone.[30] This caused one researcher to conclude:

> [I]dentifications made by policemen in highly competitive activities, such as undercover narcotics agents, whose chances for promotion may depend upon the number of arrests made because of their sales, should be scrutinized with special care.[31]

Based upon current research about the operation of the memory, experts have de-

---

you find that the police officer is lying. He saw the defendant too many times." Trial Transcript at 182–83. Record, Volume II.

25. *See, e. g.*, Loftus, *supra* note 16, at 163; Wall, *supra* note 16, at 14.

26. Stanford, *supra* note 18, at 983.

27. Stanford, *supra* note 18, at 983–84 n.53. *See also* Loftus, *supra* note 16, at 60; Wall, *supra* note 16, at 119–22.

28. G. Williams, The Proof of Guilt (1963). *See also* sources cited in note 27.

29. Trial Transcript at 77–82. Record, Volume II.

30. In the instant case, the identification was made by an officer who, having completed five months of undercover work, was driving in a squad car with his supervisor looking for the culprits. Trial Transcript at 67–68. Record, Volume II.

31. Wall, *supra* note 16, at 14. Commentators argue that the chance of mistake becomes even more severe if a cross-racial identification is involved. Studies indicate that people have greater difficulty recognizing faces of another race than faces of their own race. Loftus, *supra* note 16, at 136; Yarmey, *supra* note 16, at 130. And, interestingly enough, they conclude that it is not true that people who have frequent contact with members of another race are more accurate in identifying members of that race. Loftus, *supra* note 16, at 138; Yarmey, *supra* note 16, at 131. If they are correct, in a case of cross-racial identification facial identification should become less significant than in an identification by a member of the same race. Factors like height, weight, age, distinguishing characteristics (like facial hair), and clothing should become more important than they would otherwise be.

We cannot tell from the record if this case involves a cross-racial identification. But it bears noting that Officer Scott's identification was purportedly a facial one. In light of the research in this area, the discrepancies in his testimony concerning "Number 8" would be all the more important if this was a cross-racial identification.

veloped several "danger signals" to sensitize investigators and courts to the danger of a mistake in memory. We have mentioned some: a growing confidence in the testimony on the part of the witness, a claim of special ability as an observer, a setting conducive to "transference," a context that creates pressure on the witness to identify someone. Other "danger signals" include: omissions in the initial description,[32] a lapse in time between the relevant encounter and the identification,[33] and a serious discrepancy in the description—especially a discrepancy in height, weight or age.[34] Significantly, every one of these danger signals is present in the case at hand.

### III. THE SCOPE OF THE ONE–EYE-WITNESS RULE

This case and the research just reviewed are sobering reminders of the principle already embraced by this court: "identification testimony presents special problems of reliability," and "the very real danger of mistaken identification [is] a threat to justice."[35] Even in cases lacking all of the indicia of unreliability outlined by this court, serious doubts about the validity of identifications have arisen.[36] Still, with exceptions requiring corroboration for particular crimes (notably sex offenses, where the urge to fantasize or motive to fabricate makes the risk of misidentification high),[37] this circuit permits convictions based upon the uncorroborated identification testimony of a single eyewitness.[38] This rule developed out of necessity: certain crimes are solitary.[39] Reluctantly, we accepted the dangers latent in "one eyewitness" identifications, but we sought to mitigate those dangers by adopting detailed jury instructions.[40]

The case before us today puts the problem of "one eyewitness" identification in a different light—certainly, one that did not occur to me as a member of the panel in *United States v. Telfaire*,[41] the landmark case on this subject. Here, the police conducted a five month long investigation. From the outset, they knew that the crux of many of the cases brought at the close of the investigation—including the case against "John Doe Number 8"—would be an eyewitness identification made by Officer Scott. Nevertheless, the police apparently made no effort to create corroborating evidence to support that identification. No other officer—not even Detective James McNamara, Scott's on-sight supervisor—"covered" any of the sales. Nobody watched from a distance. No third party was produced who had witnessed, or had been present at, any of the transactions. No photographs were taken. Officer Scott was not wired for a sound recording. "Number 8's" fingerprints were not taken from any of the objects handled by him. And, over a five month period, no attempt was made to track "Number 8" to an address or to identify him by name.

32. Wall, *supra* note 16, at 100.

33. *Id.* at 127.

34. *Id.* at 99–100. The maximum deviation in weight that should be expected, for example, is one of 20 pounds. E. Gardner, The Court of Last Resort 82 (1952). The discrepancy in the case at hand was 45 to 60 pounds.

35. *United States v. Telfaire*, 469 F.2d 552, 555 (D.C.Cir.1972). *See also, e. g., United States v. Greer*, 538 F.2d 437, 442 (D.C.Cir.1976); *United States v. King*, 461 F.2d 152, 156–58 (D.C.Cir. 1972) (Bazelon, C. J., concurring); *United States v. Hamilton*, 420 F.2d 1292, 1295 (D.C. Cir.1969).

36. *See, e. g., United States v. Greer*, 538 F.2d 437 (D.C.Cir.1976) (where *after* the case came to us on appeal the eyewitness recanted his identification).

37. *Coltrane v. United States*, 418 F.2d 1131, 1135 (D.C.Cir.1969).

38. *United States v. Telfaire*, 469 F.2d 552 (D.C. Cir.1972); *Jones v. United States*, 361 F.2d 537 (D.C.Cir.1966); *Thompson v. United States*, 188 F.2d 652 (D.C.Cir.1951); *Bullock v. United States*, 157 F.2d 702 (D.C.Cir.1946).

39. *United States v. Telfaire*, 469 F.2d 552, 554 (D.C.Cir.1972).

40. *Id.* at 558–59.

41. 469 F.2d 552 (D.C.Cir.1969).

Instead, after 100 buys and thousands of faces over a five month period, Officer Scott was released into the community armed only with his "Buy Reports" and his recollection of "Number 8." With warrants for thirty-seven "John Doe's" in hand,[42] he drove through the streets with Detective McNamara until he picked Robert Butler from the crowd and said that he was "Number 8." Apparently the use of such "John Doe" warrants is standard procedure.[43]

One need not be versed in the extraordinary unreliability of eyewitness testimony to tremble at the spectre of policemen roaming the streets with warrants for the arrest of nameless citizens who will be plucked from the throng and convicted based upon the uncorroborated memory of the arresting officer. That this is standard procedure is appalling. That it is standard procedure in cases where corroborating evidence could be obtained with reasonable effort is unconscionable.

To use the "one eyewitness" rule to support convictions where corroboration can be obtained with reasonable effort is to expand that rule far beyond its original justification. It may so inexcusably flirt with the danger of mistaken identification as to be a violation of due process.[44] It certainly challenges concepts of fairness, for it in effect means that a citizen may be convicted solely on the basis of a policeman's statement that he did something on a date months in the past, a date the defendant is unlikely to recall in any detail.

In Great Britain, after two particularly egregious cases of mistaken identity, a committee was established under the chairmanship of Lord Devlin to study the problem of "one eyewitness" identification. The Committee seriously entertained a proposal that would have barred any conviction based upon an uncorroborated eyewitness identification:

Such a requirement, absolute or conditional, is the obvious remedy when the prosecution is relying upon a class of evidence that may have inherent defects. It is the well-tried remedy which both Parliament and the judiciary have regularly applied in the past. So once the need or the desirability for some sort of safeguard is granted, corroboration is the natural one to employ and the onus passes to its critics to make out a case against it.[45]

Eventually, due to a fear that an across-the-board ban on convictions based upon uncorroborated identification was too harsh a remedy, Lord Devlin's Committee declined to adopt a *per se* rule excluding such convictions. Instead, acknowledging the grave danger of injustice convictions of this sort present, the Committee recommended that they be permitted only in special circumstances or where evidence exists to support the identification.[46]

We need not entertain an across-the-board ban on convictions based upon uncorroborated eyewitness testimony to address the problem I have outlined. We already require corroborating evidence to support some "one eyewitness" testimony.[47] I propose merely the additional requirement of a good faith effort on the part of police to obtain corroborating evidence for eyewitness testimony in cases where such evidence can be acquired with reasonable effort. In a case where the government desires to use such uncorroborated evidence, it would be required to show that it could not have reasonably acquired corroborating evidence. Fundamental fairness demands this much.[48]

---

**42.** Trial Transcript at 57. Record, Volume II.

**43.** Trial Transcript at 68. Record, Volume II.

**44.** *Cf. Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

**45.** Report to the Sec'y of State for the Home Dep't of the Departmental Comm. on Identification in Criminal Cases 79 (April 1976), *quoted in* Stanford, *supra* note 18, at 1001–02 n.151.

**46.** *Id.* at 149–50, *quoted in* Stanford, *supra* note 18, at 1004 n.167.

**47.** *See, e. g.,* note 37 and accompanying text. *See also* Wall, *supra* note 16, at 184–85; 7 J. Wigmore, Evidence § 2034– (Chadbourne rev. ed. 1978); U.S.Const. art. III, § 3.

**48.** I would remand this record to afford the government an opportunity to explain why it did not obtain evidence corroborating Officer

## IV. CONCLUSION

This case lays bare the dangers of the "one eyewitness" rule. Nothing justifies Scott's testimony. But assuming *arguendo* that the government could justify its reliance on uncorroborated testimony, the question remains whether there was sufficient evidence of guilt to send this case to the jury. Because the majority opinion applies what I believe is a clearly incorrect standard in its discussion of this issue, I feel compelled to note the following views.

The due process clause demands that to convict a criminal defendant the state must prove guilt beyond reasonable doubt. *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Moreover, if this requirement is to have meaning, a court of appeals must be able to review whether the trier of fact has properly applied the reasonable doubt standard. In the course of such review, the appellate court must ask whether the evidence presented at trial was sufficient to enable a reasonable fact finder to determine guilt beyond reasonable doubt. Questions of the sufficiency of evidence thereby assume a constitutional dimension.

Over three decades ago, in *Curley v. United States*, 160 F.2d 229 (D.C.Cir.), *cert. denied*, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947), Judge Prettyman described the standard employed by our circuit to evaluate the sufficiency of evidence in appeals from denials of motions for directed verdicts. Noting the limits of the jury's responsibilities, Judge Prettyman added: "It is the function of the judge to deny the jury any opportunity to operate beyond its province." *Id.* at 232. In this fashion, Judge Prettyman viewed the reasonable doubt standard as the boundary between the provinces of judge and jury. Thus, "[i]f the evidence is such that reasonable jurymen must necessarily have such a doubt, the judge *must* require acquittal, because no other result is permissible within the fixed bounds of jury consideration." *Id.* (emphasis added).

In *Curley*, Judge Prettyman offered an alternative formulation of this rule: "[T]o state it another way, if there is no evidence upon which a reasonable mind might fairly conclude guilt beyond reasonable doubt, the motion [for acquittal] must be granted." *Id.* at 232–33. This second formulation has been quoted frequently in this circuit. *See, e. g.,* Majority Opinion at 729–730. Unfortunately, however, as it has been repeated, the critical notion that evidence must be sufficient to prove guilt beyond reasonable doubt has sometimes been deemphasized, and a kind of "no evidence" rule has sometimes emerged. Such a "no evidence" rule is both unfaithful to the *Curley* standard and violative of the due process clause of the Constitution.

There is an important practical difference between a trial record that contains some evidence the extension of that rule to cases where corroborating evidence can reasonably be obtained by the police. Thus, corroborating evidence tending to prove guilt (the no evidence rule) and a record that contains enough evidence to persuade some rational fact finder of guilt beyond reasonable doubt (the constitutional test). As Justice Stewart has noted, "a properly instructed jury may occasionally [improperly] convict even when it can be said that no rational trier of fact could find guilt beyond a reasonable doubt . . . ." *Jackson v. Virginia*, 443 U.S. 307, 317, 99 S.Ct. 2781, 2788, 61 L.Ed.2d 560 (1979). Almost always, there will be some evidence to support such an errant verdict. But the Constitution demands more searching appellate review—review calculated to determine whether the trial judge has permitted the jury to operate beyond the boundary of its authority.

In *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court explicitly declared the "no evidence" standard constitutionally unacceptable. *Jackson* arose from a request for relief on a writ of habeas corpus. Thus, it might be argued that, because of the power of a federal habeas court to hold de novo evidentiary hearings, *see* Wright & Sofaer, *Federal Habeas Corpus for State Prisoners: The Allocation of Fact-Finding Responsibility*, 75 Yale L.J. 895, 897 n.10 (1966), standards adduced for review of habeas petitions are not relevant to direct review. But in *Jackson* the Court indicated that the application for habeas corpus relief should be decided "upon the record evidence adduced *at the trial*," 443 U.S. at 324, 99 S.Ct. at 2792 (emphasis added). The Court thereby placed the habeas court and a court sitting in direct review in precisely the same situation *vis a vis* the trier of fact. Thus, the Court's instruction regarding the requirements of due process applies with equal force in both contexts. *Accord, The Supreme Court 1978 Term—Standard of Review of Sufficiency of Evidence Supporting Criminal Conviction*, 93 Harv.L.Rev. 210, 216 (1979). This result is consonant with the principle that standards to be applied on direct review are traditionally more stringent than those applied in habeas proceedings. Other circuits accordingly have already applied *Jackson* in cases of direct appeals. *See, e. g., United States v. Laughman*, 618 F.2d 1067 (4th Cir. 1980); *United States v. Fera*, 616 F.2d 590 (1st Cir. 1980); *United States v. Melchor-Lopez*, 627 F.2d 886 (9th Cir. 1980). Therefore, it is now beyond cavil that the due process clause requires an appellate court to judge the sufficiency of the evidence by asking whether, based upon the evidence offered, a rational fact finder could find guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. at 317, 99 S.Ct. at 2788.

evidence should be required in cases of this sort. In this case, however, the government has not yet had the opportunity to demonstrate that a reasonable effort would not have produced corroborating evidence. Therefore, I would remand the record for a hearing and findings of fact on that issue. If the government does not have any corroborating evidence and cannot demonstrate that a reasonable effort was made to produce it, I would instruct the trial judge to enter a judgment of acquittal. If the government does have corroborating evidence but merely did not present it at trial, I would instruct the trial judge to entertain a motion for a new trial. Only in this way can we address the terrible issues raised by this case. Accordingly, I dissent.

## APPENDIX I

*Buy Report # 1*

Metro-Police Dept.

Wash.

Thursday, June 30, 1977

Buy Sheet for John Doe # 8

Name

Alias

Address

Descript. approx.—NM—d. comp.

Height—5′9″

Weight—189 lbs.

Age—35 yrs.

Clothing—blue hat, white T-shirt, green army pants, black shoes.

Date—Thursday, June 30, 1977

Time—1930 hrs.

Purchased—3 pink tablets BI–62

Where Purchased—front of 1331 T St. N.W.

Price—$33.00

While parked at 14th & Wallach St. N.W. John Doe # 8 approached my car and said bam and I said yeah. I then said hey $11.00 and he said OK. John Doe # 8 then got into my car and said let's go to T St. N.W. I then drove John Doe # 8 in front of 1331 T St. N.W. and I then handed him $33.00 with my right hand and John Doe # 8 then got out of my vehicle and went on the porch of 1331 T St. N.W. and returned to my car and handed me three pink tablets BI–62 with his right hand. I then left the area.

*Buy Report # 2*

Metro-Police Dept.

Wash, D.C.

Tuesday, August 16, 1977

Buy Sheet on John Doe # 8

Name

Alias—Billy

Address

Descript. Approx.—NM—d. comp.

Height—5′9″

Weight—185 lbs.

Age—35 yr.

Clothing—blue hat, black T-shirt, blue pants, black and white shoes

Date—Tuesday, August 16, 1977

Time—2200 hrs.

Purchased—two pink tablets BI–62

Where purchased—14th and Wallach St. N.W.

Price—$20.00

While standing on the corner of 14th and Wallach St. N.W. I saw John Doe # 1 and John Doe # 8 talking with each other. I then approach John Doe # 8 and said bam and he then said how many did I want and I said two and he then said that's $20.00. I then handed John Doe # 8 twenty dollars and he then took two pink tablets BI–62 from his right pants pocket and handed it to me. John Doe # 1 then asked John Doe # 8 how many did he have left because someone else wanted some bam. John Doe # 8 then handed another person three pink tablets BI–62 and the other person handed John Doe # 8 some money. I then talked with John Doe # 1 about five minutes and left the area. Before I left I heard John Doe # 1 call John Doe # 8 (Billy).

*Buy Report # 3*

Metro-Police Dept.

Wash., D.C.

Friday, August 19, 1977

Buy Sheet on John Doe # 8

Name—

Alias—Billy

Address—

Descript. Approx.—NM—d. comp.

Height—5′9″

Weight—185 lbs.

Age—35 yrs.

Clothing—red shirt, blue hat, blue pants, black & white shoes

Date—Friday, August 19, 1977

Time—0100 hrs.

Purchased—2 pink tablets BI–62

Where purchased—14th & Wallach St. N.W.

Price—$20.00

While standing on the corner of 14th & Wallach St. N.W. John Doe # 8 said bam and I said yeah how much and John Doe # 8 said $10.00 and I then said give me two and handed him twenty dollars. John Doe # 8 then handed me 2 pink tablets BI–62 with his right hand. I then took the pink tablet and left the area.

*Buy Report # 4*

Metro-Police Dept.

Wash. D.C.

Monday, October 31, 1977

Buy Sheet on John Doe # 8

Name—

Alias—Billy

Address—

Descript. Approx.—NM—must.

Height—5′9″

Weight—175 lbs.

Age—35 yrs.

Clothing—black hat, black jacket, blue jeans

Date—Monday, October 31, 1977

Time—2000 hrs.

Purchased—2 pink tablets BI–62

Where-Purchased—14th & Wallach Pl. N.W.

Price—$18.00

While parked abreast at 14th and Wallach Pl. N.W. John Doe # 8 said bam and I then said how much and he said nine dollars and I then said for him to give me two, which he handed me two pink tablet BI–62 with his right hand. I then handed John Doe # 8 $18.00 with my right hand. John Doe # 8 then asked me if I needed any works and I told him that I didn't.

### APPENDIX II

*Description of Robert Butler Excerpted from P.D. 854, Morals Division File Report, Report of Investigation, and P.D. 163, Prosecution Report, Found in Record, Volume I*

Name—Robert Butler

Nickname—Bobby

Height—5′7″

Weight—130 lbs.

Age—29 yrs.

Clothing—maroon flop hat, brown leather jacket, blue dungarees, red boot type shoes