**2019 UT App 3**

## THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
KENNETH MORRIS BOWDREY,
Appellant.

Opinion
No. 20170033-CA
Filed January 10, 2019

Third District Court, Salt Lake Department
The Honorable Mark S. Kouris
No. 161905902

Teresa L. Welch, Brenda M. Viera, and Tessa Hansen,
Attorneys for Appellant

Sean D. Reyes and Jonathan S. Bauer, Attorneys
for Appellee

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGES GREGORY K. ORME and KATE APPLEBY concurred.

MORTENSEN, Judge:

¶1      In short, this is not a *Long* case.[1] A police officer (Officer), using a spotting scope in a surveillance operation to detect drug

---

1. *See State v. Long*, 721 P.2d 483 (Utah 1986). In *Long*, the Utah Supreme Court stated that "trial courts shall give [a cautionary] instruction [to apprise the jury of the limitations of eyewitness identification] whenever eyewitness identification is a central issue in a case and such an instruction is requested by the defense." *Id.* at 492. The holding in *Long* was modified by *State v. Clopten*, 2009 UT 84, 223 P.3d 1103, to grant trial judges discretion when deciding whether to give a cautionary

(continued…)

dealing, directed other officers (the Arrest Team) via police radio to detain Kenneth Bowdrey. Officer then joined the Arrest Team and confirmed that his colleagues had apprehended the correct suspect. Bowdrey argued that Officer's post-surveillance confirmation entitled him to a cautionary jury instruction—a *Long* instruction—about the limitations of eyewitness identification. The trial court denied his request. Bowdrey now appeals his conviction for drug distribution. We affirm.

## BACKGROUND

### *The Arrest*

¶2  Around 10:00 p.m. on May 27, 2016, Officer was conducting surveillance of possible drug dealing near Salt Lake City's homeless shelter. In a concealed location about one hundred yards away, Officer used a spotting scope to observe the area near the shelter. The scope was not equipped with a recorder or night vision, but Officer reported he could see the area "very well" because he had an unobstructed view and the area around the shelter was "very well-lit . . . even at nighttime." His view of the area was interrupted only by the passing of an occasional light rail commuter train. Officer was accompanied by a new recruit, whom he was training. The recruit used her own spotting scope, and she and Officer discussed their observations.

¶3  After watching the area through his scope for about thirty minutes, Officer observed three men conducting what appeared to be drug transactions. Two of the men (the Sellers) spit items

---

(…continued)
instruction in cases where testimony of an eyewitness expert is heard. *Id.* ¶ 34.

out of their mouths after people gave them cash. Officer observed the Sellers conduct about ten such transactions each. Officer stated that the Sellers' behavior was consistent with his knowledge of drug dealing practice. Officer explained that after a buyer gives a seller cash, the seller proceeds to spit twists[2] and hands over the drugs to the buyer. Drug sellers often work with a "holder." According to Officer, a holder stays at a distance from the sellers and retains the bulk of the drug inventory, while the sellers conceal small quantities of twists in their mouths as they conduct sales. Officer explained that sellers use this method so that they can swallow or spit out the drugs if approached by police officers.

¶4 Officer observed the Sellers approach a holder two times each between sales. Officer reported that the holder would take a pill bottle out of his jacket; the Sellers would receive the bottle, transfer its contents to their mouths, and then continue selling drugs. Officer noted that the holder appeared to be smoking a crack pipe when he was not resupplying the Sellers. Officer described the holder as a "tall black male approximately 50 years old who was wearing a red backpack."

¶5 Officer radioed the Arrest Team to stop the three men he had been observing, namely the Sellers and the holder. The Sellers ran when the Arrest Team approached them, but they were stopped about forty feet from where the holder was detained. The holder did not run when the Arrest Team approached him. Officer continued to watch through his scope as the Arrest Team detained the holder. Officer informed the

---

2. According to officer, a "twist" is a method of prepackaging an individual dose of illegal drugs in several layers of plastic wrap. White twists contain crack cocaine and black twists contain heroin. The drugs typically are wrapped in plastic at an off-site location for sale on the street.

Arrest Team members that they had "the right person at the time they made the initial stop."

¶6      After the three suspects were in custody, Officer left his place of concealment and joined the Arrest Team. Once there, Officer confirmed that the Arrest Team had detained the holder he had been watching. Officer stated that he "didn't further identify [the holder], because [Officer had] already done that. They held—detained him until [Officer] arrived on the scene."

¶7      The holder was identified as Bowdrey. Bowdrey had a crack pipe when the Arrest Team approached him. A search of Bowdrey, conducted by Officer, revealed a pill bottle inside a sock in Bowdrey's jacket. The pill bottle contained about thirty black and white twists of heroin and cocaine. The Sellers detained along with Bowdrey did not have any drugs on them at the time, but each had a substantial amount of cash.

*Proceedings at Trial*

¶8      The State charged Bowdrey with two felony counts of possession of a controlled substance with the intent to distribute and one misdemeanor count of possession of drug paraphernalia. Officer, the recruit, and members of the Arrest Team testified at trial about the events leading up to Bowdrey's arrest.

¶9      At the close of the State's case, Bowdrey requested a *Long* instruction on the reliability of eyewitness identification. Bowdrey argued that Officer's confirmation to the Arrest Team members that they had apprehended the suspected holder constituted an eyewitness identification. Bowdrey did not argue that the request for the *Long* instruction was related to Officer's observation of Bowdrey while Officer conducted surveillance; rather the members of the Arrest Team "were waiting for [Officer] to come and confirm that this was the person. And that

certainly does make an identification by Officer . . . and that does qualify under the *Long* instruction, that he's making identification." Thus, Bowdrey asserted that he was entitled to a *Long* instruction because Officer identified Bowdrey as the correctly apprehended holder after Officer had left his position of concealment and joined the Arrest Team. The State opposed Bowdrey's request, arguing that Officer's confirmation to the Arrest Team was not an after-the-fact identification like the one contemplated in *Long*; rather, "[t]his is a case where the officer saw someone engaging in conduct, saw the person arrested, that person remained in custody, [and] that person was then booked into jail." The trial court agreed with the State and denied Bowdrey's request.

¶10 Bowdrey then testified at trial. He stated that he had been living at a homeless shelter and worked odd jobs, getting paid in cash under the table. He used his money to buy cigarettes, beer, and crack cocaine. He testified that on the night he was arrested, he had finished smoking cocaine at his preferred spot in the neighborhood and was making his way toward the homeless shelter, where he planned to sleep. On his way there, Bowdrey stated that he saw "somebody throw something in the garbage can." Intrigued and thinking it might be money, Bowdrey said he retrieved the item and put it in his pocket. The item turned out to be a sock. Bowdrey explained, "Every time I see . . . a sock, I'm picking it up because . . . [n]ot too long ago I found $200." But Bowdrey stated that he did not immediately open the sock to investigate its contents owing to the police presence in the area and not wanting to call attention to himself. After smoking some cocaine with a friend he met along the way, Bowdrey was apprehended by the Arrest Team. At trial, Bowdrey's counsel summed up his argument in these terms: "Mr. Bowdrey is here today to tell you . . . that well, yes, he was there and, yes, he did have a crack pipe, but he was not selling. He was not working

with anyone to sell, and . . . that was simply, quite frankly, a wrong place, wrong time for him."

¶11    After Bowdrey testified, the State recalled Officer to ask if it was possible that the Arrest Team "stopped the wrong guy." Officer responded, "Absolutely not. . . . Mr. Bowdrey was the key to our case. So I was watching the whole time. If we didn't get the holder with the drugs, we would have just had two other guys holding cash . . . . I was watching the whole time as . . . [the Arrest Team] did the takedowns. So I made sure they got the right guy."

¶12    The jury convicted Bowdrey of all three charges. Bowdrey appeals.


ISSUE AND STANDARD OF REVIEW

¶13    The issue before this court is whether the trial court erred in refusing to grant Bowdrey's requested *Long* instruction. "Whether the trial court erred in not giving a cautionary eyewitness instruction to the jury is a question of law which we review for correctness, giving no deference to the trial court's conclusions." *State v. Snyder*, 932 P.2d 120, 125 (Utah Ct. App. 1997).


ANALYSIS

¶14    Trial courts are required to give a cautionary instruction to a jury "whenever eyewitness identification is a central issue in a case and such an instruction is requested by the defense." *State v. Long*, 721 P.2d 483, 492 (Utah 1986). Bowdrey argues that *Long* required the trial court to give the jury a cautionary instruction about the limitations of eyewitness testimony, because (1) Bowdrey requested it and (2) Officer's identification of Bowdrey to the Arrest Team constituted a central issue in the

case. We disagree. Although it is clear that Bowdrey requested the *Long* instruction, we do not consider Officer's confirmation to Arrest Team members that they had apprehended the correct suspect "a central issue" as contemplated in *Long*. And when eyewitness identification is not a central issue, the trial "court retains significant discretionary authority to refuse to submit such an instruction to the jury." *State v. Robertson*, 2005 UT App 419, ¶ 12, 122 P.3d 895.

¶15 Officer made a continuous, real-time observation of Bowdrey as he engaged in selling drugs and was subsequently detained by the Arrest Team. Officer's post-surveillance confirmation that Bowdrey was the holder was not an identification as contemplated in *Long*, because *Long* addressed the problem of the reliability of eyewitness identifications based on the "process of perceiving events and *remembering* them." *Long*, 721 P.2d at 488 (emphasis added). Indeed, the *Long* court describes at some length the weaknesses of the "memory process" as justification for its decision, noting that numerous "studies all lead inexorably to the conclusion that human perception is inexact and that human memory is both limited and fallible." *Id*. at 488–91.

¶16 Thus, eyewitness identification based on *memory* is the key factor in *Long* and its progeny. In *Long*, the witness failed to pick out the defendant from a photo lineup three days after an assault but later identified him at a preliminary hearing and during trial. *Id*. at 484. Cases applying *Long* also involve identifications made from memory after the perceived event. For example, in *State v. Clopten*, 2009 UT 84, 223 P.3d 1103, the identification occurred after a shooting in a "show up" and in a photo array. *Id*. ¶¶ 45–46. Additionally, in *State v. Maestas*, 1999 UT 32, 984 P.2d 376, the victim identified suspects after a robbery in a show up situation. *Id*. ¶ 8. Further, in *State v. Snyder*, 932 P.2d 120 (Utah Ct. App. 1997), two girls made identifications three years after the defendant allegedly exposed himself to

them. *Id*. at 122, 124. *Long* and its progeny all share in common eyewitness identifications based on *memory* and made after—sometimes years after—the incident in question.

¶17 Put succinctly, the facts surrounding Officer's identification of Bowdrey as the suspected drug holder do not match the pattern established by *Long* and its progeny. The difference between this case and the *Long* precedent is that Officer's identification was not memory-based. Although Officer made an in-person confirmation to the Arrest Team that Bowdrey was correctly detained, Officer had already identified Bowdrey *in real-time* (1) participating in a drug selling operation and (2) being detained. Officer testified that he identified Bowdrey by "keeping [his] eyes on him the entire time." Officer was able to identify Bowdrey "because [he] saw [Bowdrey] taken into custody through [his] spotting scope." Thus, Officer's contemporaneous identification of Bowdrey during the surveillance period was not memory-based; rather it was the result of direct observation of Bowdrey over a period of thirty minutes—as he supplied drugs to the Sellers and up to the moment of his detention.

¶18 Even though Officer testified that he "actually watched [the Arrest Team] take [Bowdrey] down," Bowdrey still argues that he is entitled to a *Long* instruction because Officer came "onto the scene" to "confirm" that Bowdrey was the correct individual to detain. But Bowdrey misapplies *Long* when he argues that Officer's confirmation to the Arrest Team constituted an identification. The key fact is that Officer already identified Bowdrey in real-time as he directed the Arrest Team to apprehend Bowdrey. At no point in the sequence of events leading to Bowdrey's detention did Officer's memory of Bowdrey's identity come into play. As this court has pointed out, a *Long* instruction in this case would be misapplied because it would go to the *circumstances* of Bowdrey's arrest rather than his *identification*. *See State v. Pascual*, 804 P.2d 553, 555 (Utah Ct. App.

1991) (explaining that a *Long* cautionary instruction is not required when it "goes to eyewitness testimony as to *circumstances*, not *identification*"). Thus, Officer's post-detention confirmation that the Arrest Team had detained the correct person is not "a central issue" requiring a *Long* instruction; rather the post-detention confirmation was a mere circumstance of Bowdrey's arrest after Bowdrey had already been identified.

CONCLUSION

¶19    Because Officer's identification of Bowdrey was based on real-time observation rather than recall from memory, the trial court correctly denied Bowdrey's *Long* request. The circumstances of Officer's confirmation that Bowdrey was correctly arrested place this case in a different category than that contemplated in *Long*. Accordingly, we affirm.

————